**FEDERAL ENTERPRISES, INC., a Missouri Corporation, and Douglas S. Evans, Trustee in Bankruptcy, Appellants,**

v.

**GREYHOUND LEASING & FINANCIAL CORP.,**
**Appellee.**

No. 84–2631.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1985.

Decided March 17, 1986.

Christopher J. Stark, Springfield, Mo., for appellants.

John R. Lewis, Springfield, Mo., for appellee.

Before HEANEY, FAGG and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Douglas S. Evans, Trustee in Bankruptcy for Federal Enterprises, Inc. (Federal), appeals from the judgment entered by the District Court upon a jury verdict for Greyhound Leasing & Financial Corporation (Greyhound) on Evans's claim for $204,250 that Greyhound allegedly owed to Federal. The District Court denied Evans's motion for a new trial and this appeal followed. We reverse and remand for a new trial.

Federal was a manufacturing corporation owned by three shareholders, each holding approximately one-third of the issued and outstanding shares of corporate stock. The shareholders—Nathaniel P. Gunn, Edward P. Schneider, and Richard M. Baldwin—also served as corporate officers and directors. Schneider, president of his own engineering company, and Baldwin, a physician, were not involved in the day-to-day activities of the corporation. Gunn, however, served as Federal's president and appears to have actively controlled every phase of its operations. In May 1980, Gunn completed negotiations on a sale by Federal of coal processing equipment to Blue Eagle, Inc. Because Gunn was also the president and sole shareholder of Blue Eagle, he effectively had been negotiating both sides of the deal. To implement the sale, Federal submitted a proposal to Greyhound, which regularly finances such business transactions, whereby Greyhound would buy the equipment and lease it to Blue Eagle.

In reviewing the proposal, a Greyhound employee located in its St. Louis office, James M. Brown, collected financial data about Federal and background information about the officers and directors. With the exception of certain reports from independent sources such as Dunn and Bradstreet, almost all the information Brown secured came from Gunn in his capacity as president of Federal. Greyhound's credit committee reviewed Brown's recommendations and approved the transaction subject to several conditions. Greyhound required a letter of credit from Blue Eagle for $204,250 (one-quarter of the total purchase price), a corporate buy-back agreement whereby Federal agreed to buy the equipment from Greyhound if Blue Eagle defaulted on its obligations, and a personal guarantee from Gunn and his wife for $204,250.

At the meeting closing the transaction, Gunn and Donald Boutot, a Federal employee, represented Federal, and John Greene, an employee of Greyhound, represented Greyhound. Gunn failed to provide Greyhound with a letter of credit from Blue Eagle on a bank acceptable to Greyhound. Gunn and his wife, however, had executed a personal guarantee for $204,250. At the meeting, Gunn directed Greyhound to pay Federal $612,750 and to pay the balance of $204,250 to a savings and loan. In lieu of Blue Eagle's letter of credit, Greyhound was to hold the $204,250

in what seems to be an escrow account pending full performance by Blue Eagle of its obligations under the lease. There is no indication in the record as to what was to become of this money if Blue Eagle fully performed its obligations to Greyhound. Gunn explained this distribution of the purchase price by stating that Blue Eagle already had made a partial payment to Federal on the purchase price.[1] Greyhound, waiving its previous requirement of a letter of credit, agreed to and followed Gunn's instructions, and received from Gunn a receipt reflecting this distribution of payments.

About a month and a half after the closing, Federal, having received only three-quarters of the purchase price of the equipment, demanded payment of the remaining $204,250 from Greyhound, which responded with an explanation of the distribution of the purchase price made at the closing. Gunn had left Federal shortly after the closing, and almost all the records of the transaction were missing from Federal's files. Several months later, Federal filed suit against Greyhound. In a separate proceeding brought by its creditors, Federal was adjudicated an involuntary bankrupt, and Evans, having been appointed trustee, was substituted as plaintiff in this action.

The case was tried before a jury which returned a verdict for Greyhound. In moving for a new trial, Evans argued that the

District Court should have given his proposed instructions A through N rather than two of the instructions actually given, to wit., instructions 6 and 7. Evans also argued that the District Court had erred in allowing Greyhound to introduce certain exhibits related to the transactions at issue and by allowing Brown to testify. Finally, Evans also asserted that permitting Greene to testify about Greyhound's distribution of the purchase price pursuant to Gunn's instructions to Federal was error. The District Court denied Evans's motion for a new trial, and this appeal ensued. For reversal, Evans reiterates the same arguments that he raised in his post-trial motion.

We consider first Evans's contention that the District Court erred by giving jury instructions 6 and 7 and by failing to give his proposed instructions A through N.[2] Evans tendered instructions A through N on the basis that they set forth the current Missouri law with respect to the issues in the case regarding agency and scope of authority, which instructions 6 and 7 failed to present.[3] Evans specifically objected to instruction 6 on the ground that it misstated the law and did not apply to the case. Evans argued that instruction 6 assumed the agency of Gunn, did not explain the proper burden of proof to prove agency, and failed to define "apparent authority"

1. On its face, this seems implausible since Greyhound was to purchase the equipment and in turn lease it to Blue Eagle. The escrow arrangement obviously benefitted both Gunn (his company, Blue Eagle, got the equipment) and Greyhound (which got $204,250 worth of assurance that Blue Eagle would make its lease payments for the use of the equipment).

2. It is clear that Evans properly objected to the District Court's refusal to give proposed instructions A through N. Since these instructions, if given, would have supplanted instructions 6 and 7, it is of no importance whether Evans made separate specific objections to instructions 6 and 7. Our review of the record satisfies us that in fact Evans did make a proper separate objection to instruction 6.

3. Instruction 6 reads:
   Your verdict must be for defendant if you believe:

1. Federal Enterprises, Inc. created the appearance of authority of Nathaniel Gunn to act on its behalf in closing the transaction with defendant; and
2. Defendant relied upon such appearance of authority to close the transaction with plaintiff and in so relying, defendant was using ordinary care; and
3. Nathaniel Gunn signed the letter dated July 9, 1980, in which he gave directions for the payment of the purchase price; and
4. Defendant made the payments in full pursuant to said letter of instruction.

   The phrase "ordinary care" as used in this instruction means that degree of care that would be reasonable in defendant's situation.

   Instruction 7 reads: "Your verdict must be for defendant unless you believe Federal Enterprises, Inc. failed to receive the full purchase price of the coal washing equipment."

and "payment." In addition, Evans asserted that instruction 6 included facts or elements not included in Greyhound's affirmative defense of payment.

■ In assessing the adequacy of the instructions,[4] we must keep in mind three important points. First, the purpose of giving instructions is to inform the jury of the essential issues before them and of the various permissible ways of resolving those issues. *See Roach v. Kansas City Public Service Co.*, 141 S.W.2d 800, 803 (Mo.1940). Second, a party is entitled to an instruction reflecting that party's theory of the case if the instruction is legally correct and there is evidence to support it. *Gander v. Mr. Steak of Sun Ray, Inc.*, 774 F.2d 920, 924 (8th Cir.1985); *see Welch v. Sheley*, 443 S.W.2d 110, 118 (Mo.1969). Third, we accord a district judge broad discretion in choosing the form and language of the jury instructions. *Monahan v. Flannery*, 755 F.2d 678, 681 (8th Cir.1985).

With these guiding principles in mind, we examine the instructions to ascertain if "the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury." *Swift v. R.H. Macy's & Co.*, 780 F.2d 1358, 1360–61 (8th Cir.1985); *see Beck v. Modern American Life Insurance Co.*, 589 S.W.2d 98, 103 (Mo.Ct.App.1979).[5] The instructions should state the governing law fairly and adequately; that they are " 'technically imperfect or are not a model of clarity does not render the charge erroneous.' " *Crimm v. Missouri Pacific Railroad*, 750 F.2d 703, 710 (8th Cir.1984) (quoting *Tribble v. Westinghouse Electric Corp.*, 669 F.2d 1193, 1197 (8th Cir.1982),

*cert. denied*, 460 U.S. 1080, 103 S.Ct. 1767, 76 L.Ed.2d 342 (1983)).

■ After reviewing Evans's specific objections in light of the evidence and the District Court's charge to the jury as a whole, we conclude that the instructions fail to state the governing law adequately and fairly, and that they fail to inform the jury adequately of the essential issues raised by the evidence at trial.[6] Specifically, we find instruction 6 deficient because it is based on key terms, requiring independent factual findings, which are not defined in instruction 6 or elsewhere in the instructions. Such terms include, for example, "appearance of authority." The Missouri Approved Jury Instructions (MAI) include a notation that "[w]hen the issue of agency is submitted, the appropriate definition must also be submitted. See MAI 13.02 to MAI 13.06 [instructions on agency]." MAI 18.01, Notes on Use (1981). Along these lines, we find the use and definition of "ordinary care" inaccurate. The instructions must define more explicitly the standard of care with which Greyhound should have approached Gunn's dual roles, known to Greyhound, in his representing (or at least purporting to represent) both Federal and Blue Eagle. The standard of care explanation should include the dictate of Missouri law that a "third person dealing with an agent ... has the duty of ascertaining for himself, the agent's authority." *Erickson v. Civic Plaza National Bank of Kansas City*, 422 S.W.2d 373, 380 (Mo.Ct.App. 1967); *Springfield Television, Inc. v. Gary*, 628 S.W.2d 398, 403 (Mo.Ct.App. 1982). Such an inquiry includes determining that a supposed agent really is an agent, ascertaining the type of agency, and

---

4. This is a diversity case so we must look to Missouri law in assessing the substantive correctness of the jury instructions. *See Erie Railroad v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

5. Because the federal and the Missouri standards of review of jury instructions are similar, we do not reach the question whether federal or state law governs. *See Byrd v. Blue Ridge Rural Electric Cooperative, Inc.*, 356 U.S. 525, 538, 78 S.Ct. 893, 901, 2 L.Ed.2d 953 (1958).

6. In concluding that the instructions were deficient as a matter of law, we do not pass judgment on Evans's preferred instructions A through N, which for the most part appear to state correctly and completely Missouri law on the pertinent issues in this case, but which also seem to assume several factual findings that should be left to the jury's decision.

assuring that the act is within the limits of the agent's authority. *Erickson,* 422 S.W.2d at 380-81. Moreover, the jury should be told that it is for them to decide whether Gunn, in directing Greyhound to pay $204,250 of the purchase price to a savings and loan rather than to Federal, was acting as an agent of Federal and whether he was acting within the scope of his actual or apparent authority. Missouri law clearly denotes agency as an issue of fact to be decided by the trier of fact. *Walker v. Multi-Wood Products, Inc.,* 581 S.W.2d 617, 619 (Mo.Ct.App.1979); *Dickey v. Nations,* 479 S.W.2d 208, 211 (Mo.Ct. App.1972) (instruction ignoring vital issue of fact—agency—is fatally defective). The jury also has the duty to determine the nature and scope of an agent's authority, also questions of fact. *See Hyken v. Travelers Insurance Co.,* 678 S.W.2d 454, 457 (Mo.Ct.App.1984); *Dudley v. Dumont,* 526 S.W.2d 839, 843-44 (Mo.Ct.App.1975). In addition, the instructions should have allocated the burden of proving agency. *See Empson v. Missouri Highway & Transportation Commission,* 649 S.W.2d 517, 521 (Mo.Ct.App.1983) (burden of proving agency is on the party alleging the existence of the agency).

In reviewing the instructions as a whole, we do not find, as a matter of law, any particular problems with instruction 7. However, we anticipate that the content of instruction 7 will be subsumed on remand under the more comprehensive and detailed instructions that we believe are required.

On remand, the jury instructions should be so formulated, if the evidence at trial again warrants, to: (1) allocate clearly the burden of proof of agency; (2) define key legal terms such as "agent" and "apparent authority"; and (3) clarify Greyhound's duty to inquire into Gunn's authority and the representations he made where Greyhound knew that Gunn, purporting to act in a dual capacity, was in a position of divided loyalty. The District Court and the parties will be free, of course, to include other instructions as warranted by the evidence and the parties' theories of the case.

We have considered the other issues that Evans raises and find them meritless. For the reasons stated above, we reverse the judgment of the District Court and remand the case for a new trial consistent with this opinion.